USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/25/10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
UNITED STATES OF AMERICA

- against -

JOSEPH BARONE and ANTHONY PILIERO,

Defendants.

-----------------------------------X

**MEMORANDUM & ORDER**

S1 09 Cr. 91 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Defendant Joseph Steven Barone was arrested outside his home in New Rochelle, New York, on January 9, 2009 and charged with conspiracy to commit murder for hire and murder for hire, as well as possession of firearms by a convicted felon. On February 12, 2010, Barone moved, inter alia, for suppression of all physical evidence seized from his home, garage, and car on the day of his arrest -- on the grounds that the items were obtained in violation of the Fourth Amendment.[1] In addition to reviewing two rounds of briefing,[2] the Court held three suppression hearings on April 14 and 22, 2010, and June 15, 2010. Oral arguments were held on April 22 and June 16, 2010. Having considered the parties' briefs, the evidence adduced at

---

[1] Although Barone initially moved to suppress all statements he allegedly made on the day of the arrest regarding the location of a second firearm, as an admission elicited in violation of the Fifth Amendment, the government made clear that it is not seeking the admission of the statement itself but only the physical evidence to which it led. Barone's counsel have not pursued this aspect of the motion either in supplemental briefing or at oral argument. Accordingly, we understand this aspect of the motion to be mooted.
[2] At the oral argument on April 22, defense counsel requested the opportunity to brief additional issues.

1

the hearings, and the oral arguments, we grant the defendant's motion to suppress in its entirety.  We set forth below our factual findings and legal analysis in reaching that conclusion.

## BACKGROUND

The following facts are derived principally from the testimony of the defendant, five members of the Genovese Organized Crime Task Force of the Federal Bureau of Investigation ("Task Force") -- Special Agent Gregorio Miceli, the case agent; Special Agent Michael Gaeta, then acting supervisor of the Task Force, who supervised the arrest team;[3] Special Agent John Penza, a member of the Task Force arrest team; Salvatore Arrigo, a detective with the New York Police Department ("NYPD"), who was assisting the Task Force arrest team that day; Michael Castner, a special agent who was also supporting Gaeta's arrest team -- as well as a sixth FBI agent, Special Agent Michael Trombetta, who was Barone's handling agent at the time of his arrest.[4]  In support of his motion to suppress, Barone submitted an affidavit and testified before the Court at two of the hearings.

---

[3] Some of the FBI agents have changed roles or titles since Barone's arrest in January 2009.  In addition, while he still works in law enforcement, Detective Arrigo no longer works for the NYPD.  For the sake of clarity, this opinion refers to the law enforcement officers' titles and roles at the time of Barone's arrest.

[4] It is undisputed -- and was made public at the suppression hearings -- that Barone served as a valuable FBI informant for many years, including at the time of his arrest in January 2009.

2

**Surveillance and Debriefing; Assembling an Arrest Team**

In early January 2009, the Task Force was conducting surveillance of Barone through field agents and a cooperating witness (the "CW"). Specifically, on January 7 and January 8, the CW recorded conversations with Barone in which the two discussed an alleged murder for hire plot. (4/22/10 Tr. at 16- 18.) On Friday, January 9, 2009, Barone met with the CW for about an hour, during lunch. (Id. at 4.) Shortly after that meeting, agents debriefed the CW[5] and concluded that Barone was attempting to engage the CW in an imminent murder for hire plot. (Id. at 5.) Specifically, the CW told the agents that Barone was attempting to obtain a gun for him. (Id.) In debriefing the CW, the FBI also learned for the first time that Barone had discussed the plot with another unknown co-conspirator, whom Barone suggested he could hire to carry out the murder if the CW were unable to do so. (Id.)

After being informed of the CW's debriefing session, Supervising Agent Gaeta obtained verbal authorization from Richard Daddario, then the Chief of the Organized Crime Unit of the United States Attorney's Office for the Southern District of New York ("USAO"), to arrest Barone that day. Gaeta wanted to arrest Barone to ensure that the plot would not be carried out.

---

[5] The CW recorded his conversation with Barone, but was not equipped with a transmitter that would have enabled the surveillance agents to overhear the lunch meeting as it was taking place; instead, the agents debriefed the CW after the meeting. (Id.)

3

(Id. at 5-6.)  While Gaeta and Daddario discussed a potential search of Barone's residence in connection with the arrest authorization, (id. at 20), the agents did not apply for a warrant to search Barone's home because they concluded that they lacked probable cause for a warrant.  (See id. at 21; 4/14/10 Tr. at 64.)

After dispatching Special Agent Miceli to the USAO to begin preparing a complaint, Gaeta assembled his team of at least eight agents and detectives to effectuate Barone's arrest. (4/22/10 Tr. at 6, 21.)  Some of the agents and detectives comprising the arrest team had been conducting field surveillance on Barone earlier that day.  (See id. at 24-25.) For example, Detective Arrigo and others were stationed in the vicinity of Barone's residence, (6/15/10 Tr. at 31), while Special Agents Castner and Penza were among those who followed Barone on his way home from the grocery store with his then-girlfriend, Joanne.  (Id. at 56, 66-67; see id. at 133.)[6]

**Arresting Barone and Entering His Home without a Warrant**

Between approximately 4:00 and 4:30 p.m. that day, Gaeta's team of agents and detectives arrested Barone in the driveway of

---

[6]     In fact, none of the agents who effectuated Barone's arrest had come from the FBI office; they were all in the field earlier that day.  Penza indicated that his surveillance position shifted shortly before Barone's arrest in the driveway.  Responding to a call dispatching him to New Rochelle, Penza initially "parked up on the avenue" from where Barone's residence is located.  (See 6/15/10 Tr. at 66.)  Thereafter, Penza joined the small caravan of vehicles, which followed Barone as he drove home from the grocery store.  (See id. at 67-70.)

4

his home. (Id. at 6, 106; 4/14/10 Tr. at 46, 60.) As Barone exited his car, carrying groceries, Gaeta, Arrigo, and possibly other agents -- with guns drawn -- placed Barone under arrest by handcuffing him in the back. (4/22/10 Tr. at 21-23; 6/15/10 Tr. at 133-34.) Gaeta also stated the nature of the charges against Barone. (Id. at 134.)

Agents then brought Barone and his girlfriend into the home "for security purposes" and to avoid making a scene in the quiet residential neighborhood. (4/22/10 Tr. at 7.) Once inside, several members of the arrest team commenced a security sweep of the house. Gaeta remained in the foyer with Barone, whom the agents had separated from his girlfriend. (Id. at 7, 41.) Gaeta asked Barone if he had any weapons, which Barone denied. (Id. at 7-8, 25.) Gaeta did not believe him. (Id. at 8.) According to Gaeta, he then advised Barone of his Miranda rights[7] and Barone, after indicating that he understood those rights, told Gaeta that the situation was a "big mistake": Barone had been working with the FBI for years and they could "work it out." (Id.)

Meanwhile, at least five other agents and detectives were conducting the protective sweep of Barone's approximately 2,500 square foot, raised ranch house. (Id.; see 6/16/10 Tr. at 160.)

---

[7]     Barone testified that he was not advised of his Miranda rights until after he and the agents were en route to FBI Headquarters at 26 Federal Plaza. (6/15/10 Tr. at 134-35.)

The sweep of the sparsely-furnished rooms, hallways, closets, and other areas began once the team brought Barone inside the residence and lasted for approximately fifteen minutes. (4/22/10 Tr. at 8; 6/15/10 Tr. at 54, 106; see id. at 37.) Special Agent Penza and Detective Arrigo both participated in the upstairs sweep. Penza looked in an upstairs closet and, upon discovering the entry to an attic in the closet ceiling, lifted his head up into the small attic crawlspace. (6/15/10 Tr. at 71-72.) Detective Arrigo testified that he first looked around Barone's master bedroom and, finding nothing there or in the master bathroom, then proceeded down the hallway into a smaller bedroom opposite the master bedroom. (Id. at 25-26.)

## Discovering and Seizing the First Gun

In that second bedroom, after spotting various items on the floor in the middle of the room, (id.), Arrigo observed a long, narrow closet, with open French doors, behind and to the right of the bedroom door along the perpendicular wall. (Id. at 26, 38-39; see id. at 130.) Arrigo testified that, as he took about a quarter step into the back of that closet, he spied a gift bag in the middle of the closet floor by his feet. (Id. at 26, 35-36, 44.) According to Arrigo, the gift bag was wide open so that, standing over it, he could see a box of ammunition at the

6

top of the bag. (Id. at 26, 37)[8] Within a second of entering the closet, (id. at 44), Arrigo had lifted the bag and inferred from its significant weight that it contained more than just ammunition. (Id. at 27.) He then found a case in the bag and opened it. Inside that case was a gun. (Id.)

**Confronting Barone with the Discovery of the First Gun; Barone's Directing Agents to the Second Gun and Verbally Consenting to a Full Search of the House**

Just after seizing the gun from the closet, Arrigo called out and went downstairs to inform Gaeta, who was still speaking with Barone in the foyer. (Id. at 28; see id. at 106.) Gaeta confronted Barone with discovery of the gun (4/22/10 Tr. at 8-9), telling Barone that he had obviously lied when he denied having any weapons. (Id. at 38.) Gaeta asked Barone to tell the agents whether there were any other weapons in the house -- and if so where they were -- so they could secure the area. (Id.) At that point, Barone told Gaeta, Special Agent Castner, and possibly others, that he had another gun inside an "iron

---

[8] Barone testified to a very different placement of the bag in the closet. The closet was only slightly deeper than the width of a suit hanger and was split into two vertical sections, connected by a top shelf that spanned the width of the closet to form an off-center "T": to the left was a top-to-bottom set of eighteen-inch wide shelves; and to the right, occupying more than half the closet's width, was a clothes-hanging rung. (6/22/10 Tr. at 100, 130.) According to Barone, the gift bag that Arrigo described was on the floor "tucked away" under the bottom shelf, with a piece of pink cloth or paper on top of the bag's contents. (Id. at 101, 126.) The gift bag had wire handles, which Barone recalled had to "bend a little bit" to fit under that shelf. (Id.)

In addition, Barone testified that the placement of the bedroom door and closet doors was such that one could not open the bedroom door to find both closet doors open, because the former would have pressed against and closed one of the closet doors. (See id. at 129-31.)

box" in the garage, which Castner located after two attempts. (6/15/10 Tr. at 50-51.)[9]

In addition, once Barone was confronted with the discovery of the first gun -- either before or possibly while Castner went to retrieve the second gun from garage -- Barone verbally consented to a full search of his house, which began at approximately 4:30 p.m.  (Id. at 28, 52; 4/22/10 Tr. at 9; see also Gov't Ex. 3501-4 (noting the time).)  Barone denies, or at least does not recall, giving the agents any verbal consent to search his house.  (6/15/10 Tr. at 105-106.)

As part of the full search, and after he retrieved the second gun from the garage, Castner recovered certain items from Barone's basement -- including a bulletproof vest, a "Hitman's Handbook," and a ten-page internet printout from "Gangland," a website about the American mafia.  (6/15/10 Tr. at 52-53; Gov't Ex. 2.)  Gaeta testified that as part of the consent to a full search of the residence, Barone gave the agents specific permission and access to search his car and his safe.  (4/22/10 Tr. at 9.)  According to Gaeta, Barone gave the agents access to

---

[9]      The search for the gun in the "iron box" triggered an exchange that in hindsight provides a glimmer of comic relief in an otherwise humorless story: When Castner could not locate either the iron box or the gun after Barone's initial direction, he returned from the garage to ask Barone again where the second gun was located.   Barone reiterated that the gun was "in the iron box."   That time, Castner better understood Barone's reference.   When he returned to the garage, he did indeed find the gun in an "iron" box: a Black and Decker clothes iron box.  (Id. at 50-51; see Gov't Ex. 3501-5.)

his car keys.[10] (Id.) The search of that car lasted thirty minutes and yielded two cellular phones, papers and a notebook listing names and phone numbers, and numerous business cars wrapped in a rubber band. (6/15/10 Tr. at 64; Gov't Ex. 2.) In addition, shortly before Barone was brought from the residence to FBI headquarters, Barone opened his safe to reveal approximately $50,000 or $60,000 in cash, among other items. (4/22/10 Tr. at 19, 37; see also 4/14/10 Tr. at 57, 61; Gov't Ex. 3.) Barone testified that he opened that safe only after Gaeta had threatened, "If you don't let me in, I'll break in." (6/15/10 Tr. at 131.)

At least an hour[11] after Barone was arrested in the driveway -- while the full search of the house was still ongoing but before Barone had opened his safe for the agents -- Special Agent Trombetta arrived on the scene. (4/22/10 Tr. at 10-11; 6/15/10 Tr. at 77-79, 88, 131. But compare 6/15/10 Tr. at 89-90 (Trombetta's suggesting that while at the house, he heard that money had been found in the safe).) Both the impetus for summoning Barone's handling agent to the arrest scene and his role once there remain somewhat unclear. Gaeta testified that

---

[10]    Agent Penza, together with an NYPD detective, actually conducted the search of Barone's garaged Cadillac. (6/15/10 Tr. at 63.) Penza did not recall ever having or needing a key in order to search the vehicle, which was unlocked. (Id. at 62, 71.)
[11]    While Gaeta placed Trombetta's arrival time at approximately one hour after the arrest (4/22/10 Tr. at 10), Trombetta testified that it was "certainly after [six] o'clock or so" when he arrived -- which would have been over two hours after the 4:00 p.m. arrest. (6/15/10 Tr. at 77.)

he spoke to Trombetta a day or two before the arrest, when he
learned that Trombetta was handling Barone as an FBI informant,
because he wanted to advise the handling agent of the developing
situation with Barone and an apparent murder for hire plot.
(See 4/22/10 Tr. at 26; see also 6/15/10 Tr. at 82
("[TROMBETTA:] I think they informed me [that Barone] probably
was going to be arrested.").) On January 9, when Gaeta learned
that they were going to arrest Barone that day, he called
Trombetta to ask him to meet them at the residence to speak to
Barone. (4/22/10 Tr. at 26.) Trombetta testified that he
received a call from Gaeta early that evening informing him that
Barone had already been arrested and asking him to come to the
residence. (6/15/10 Tr. at 76, 84.) Trombetta also recalled
being told that Barone was scared and that he had asked for him.
(Id. at 84-85, 87-88.)

Once he arrived at the house, Trombetta went to the foyer
to meet with Barone, who had remained sitting there near Agent
Gaeta since his arrest in the driveway. (Id. at 78; see id. at
106.) Trombetta and Barone spoke face-to-face, with many other
detectives and agents, including Gaeta, working and moving all
around them. (Id. at 78-80, 85, 89.) Trombetta perceived
Barone as "nervous" and "scared" throughout their brief
conversation, which lasted only a matter of minutes. (Id. at
79-80.) Barone, in a "slightly agitated" tone, apologized to

10

Trombetta for the circumstances of his arrest.  (Id. at 79.)
Trombetta, in a normal tone, told Barone to be honest and
truthful with the agents if he were going to cooperate -- and
suggested that Barone should cooperate.  (Id. at 79, 86-87, 91,
96.)   Trombetta testified that, in talking with Barone, he
neither discussed the substance of the charges against Barone,
nor tried to ascertain who else was involved in the alleged plot
for which Barone had been arrested.  (Id. at 93.)[12]

Barone also testified to the circumstances of his
conversation with Trombetta.  After they spoke for a few minutes
-- with Barone apologizing to Trombetta for not telling him
about the situation for which he was arrested and reassuring his
handler that nothing was going to happen, Barone asked Trombetta
if he could help him out.  (Id. at 101-102.)   Trombetta then
spoke with Gaeta in another room, while Barone waited in the
foyer, still in handcuffs.  (Id. at 102.)   When Trombetta
returned, he indicated that the FBI wanted Barone to work for
them, and emphasized that Barone would have to be truthful if he
were going to do so.  (Id.)

---

[12]    In contrast, Agent Gaeta, with whom Trombetta subsequently discussed
the substance of the conversation with Barone, testified that Trombetta told
him that he tried to advise Barone of the seriousness of the charges the
government had against him.  According to Gaeta, Trombetta also emphasized to
Barone that the agents were concerned about the fact that other individuals
engaged with Barone in the murder for hire plot were still at large, and that
the agents needed to determine who those individuals were.  (4/22/10 Tr. at
29.)

11

In any event, following his brief conversations with Barone, Trombetta observed no change in Barone's demeanor or conduct. (Id. at 92, 99.) Trombetta departed after a short time, possibly fewer than fifteen minutes, leaving Barone with the other agents at the residence. (Id. at 92, 96.) It was after his conversations with Trombetta that Barone opened up his locked safe to reveal the cash mentioned above. (4/22/10 Tr. at 37; 6/15/10 Tr. at 131.)

## Processing Barone at 26 Federal Plaza That Evening

Ultimately, and soon after Barone opened the safe, agents transported Barone from his house to FBI Headquarters at 26 Federal Plaza for processing that evening. (4/22/10 Tr. at 11, 27-29.) Following Barone's arrival at headquarters and between 7:00 and 9:00 p.m.,[13] Gaeta conferred with Miceli, who then took charge of processing Barone. (4/14/10 Tr. at 52-53.) With Gaeta present, Miceli reviewed paperwork with the defendant -- including a receipt for the property the arrest team had seized, and a consent to search form, both of which Barone signed. (Id. at 55, 59; 4/22/10 at 27-29; Gov't Ex. 2 (property); Gov't Ex. 3501-4 (consent to search).) The consent to search form included Miceli's handwritten notation, "verbal consent given by owner/resident Joseph Steven Barone," memorializing what Gaeta

---

[13] While Gaeta placed Barone's arrival at approximately 7:00 p.m., (4/22/10 Tr. at 28-29), Miceli recalled that he himself did not arrive until approximately 9:00 p.m. (4/14/10 Tr. at 52.)

had described to Miceli as Barone's verbal consent at the residence prior to the search. (4/14/10 Tr. at 54.) According to Agents Miceli and Gaeta, they reviewed this document with Barone, including Miceli's handwritten note of prior verbal consent, and Barone signed the form[14] in a "calm and lucid" manner without complaining or denying that he had given prior verbal consent to the search. (Id. at 54-55; 4/22/10 Tr. at 13, 28.) Gaeta departed 26 Federal Plaza after Barone signed the consent to search form, while Miceli remained with Barone to complete the processing. (4/22/10 Tr. at 13.) After signing the consent and property forms with respect to the search of his residence, Barone also signed an Advice of Rights form at 10:05 p.m. (4/14/10 Tr. at 65-66; Def. Ex. 3501-10.) Before signing that form, Barone inserted a "not" on the last line, to read, "At this time, I am not willing to answer questions without a lawyer present." (4/14/10 Tr. at 62; Def. Ex. 3501-10.)

---

[14]    Although Barone testified by affidavit and in Court first, that he did not recall signing the consent to search form, and then, that he did not in fact sign that document, (4/14/10 Tr. at 49-50; 6/15/10 Tr. at 105-106), we do not credit that aspect of the defendant's testimony. Given the extensive correspondence we have received from the defendant regarding many aspects of his case, this Court knows Barone's signature when we see it. In any event, our analysis here does not turn on whether Barone signed the form at 26 Federal Plaza after the warrantless entry and search, but depends primarily on the circumstances prior to his purported verbal consent at the house.

13

As Gaeta and Miceli were completing Barone's processing that evening, it was their understanding that Barone intended to cooperate with the FBI.[15]

## DISCUSSION

The Fourth Amendment protects the "[r]ight of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," U.S. Const. Amend. IV. Because a person's right to be free from "unreasonable governmental intrusion" in his home "stands at the very core of the Fourth Amendment, [the Supreme Court has] firmly established the basic principle . . . that searches and seizures inside a home without a warrant are presumptively unreasonable," Groh v. Ramirez, 540 U.S. 551, 559 (2004), subject only to certain recognized exceptions. See, e.g., id.; Katz v. United States, 389 U.S. 347, 357 (1967).

In this case, because the Task Force arrest team searched Barone's home without a warrant, the government must establish that one of the recognized exceptions to the warrant requirement applies.[16] We therefore analyze the constitutionality of the

---

[15] Specifically, the agents understood that they would next speak with Barone in a few days, together with his attorney (yet to be appointed) and representatives from the USAO, for a full debriefing and proffer. (4/14/10 Tr. at 65; 4/22/10 Tr. at 13-14.) Notably, on January 28, 2009, Barone recorded a conversation with Anthony V. Piliero, who has since been charged in the Superseding Indictment as Barone's co-defendant in the murder for hire and murder for hire conspiracy counts.

[16] To carry their burden, the government must establish by a preponderance of the evidence that the warrantless search was conducted pursuant to an

14

agents' conduct as follows. First, we assess the basis for the entry and search of Barone's home following his arrest in the driveway. We find that, because the entry and initial search cannot be justified under either strand of the "protective sweep" doctrine -- or under any other exception to the warrant requirement -- that entry violated Barone's constitutional rights. Alternatively, and assuming, arguendo, that the agents were within constitutional bounds when they entered the house and commenced a "protective sweep," we find that Detective Arrigo's seizure of the handgun from the bedroom closet exceeded the limited scope of protective sweeps because none of the incriminating contents of the gift bag were in "plain view." Under either analysis, we hold that the first gun was unlawfully seized and therefore must be suppressed.

In addition, we consider whether the government has established that the "taint" of the primary illegality had dissipated such that some or all of the evidence seized following Barone's consents to search may be admissible. Balancing the relevant factors -- and notwithstanding Barone's

---

exception to the warrant requirement. See 27 James Wm. Moore, MOORE'S FEDERAL PRACTICE § 641.193[2] (3d ed.).

In addition, since the government further argues that the defendant's consent to search meets the requirements of the "attenuation" exception to the "fruit of the poisonous tree" doctrine, the government bears the burden of proving that such consent was "sufficiently an act of free will to purge the primary taint of the unlawful invasion." United States v. Oguns, 921 F.2d 442, 447 (2d Cir. 1990) (citation and internal quotation marks omitted). The parties do not dispute the applicable burdens here. (See 6/16/10 Tr. at 143, 171.)

15

apparent willingness to cooperate with the FBI after his house was searched and his processing was completed -- we find that the taint had not been purged and thus, that the consents themselves and the additional evidence seized were "fruit of the poisonous tree."

Accordingly, we hold that all physical evidence seized from Barone's home on the date of his arrest must be suppressed.

## I. The Warrantless Entry into Barone's Home Following His Arrest in the Driveway

The government argues that the arrest team was permitted to enter and search Barone's home without a warrant in order to conduct a "protective sweep" following Barone's arrest. We consider both potentially applicable categories of "protective sweeps" below.

### A. "Protective Sweep": Barone's "Grab Area"

At the hearing, Agent Gaeta suggested that the FBI's practice of permitting cooperative arrestees to change clothes prior to their being brought in for processing partially justified the protective sweep of Barone's bedroom and closet, where the first gun was seized. (See 4/22/10 Tr. at 7.) While neither Agent Gaeta nor the government further emphasized this suggested rationale, we briefly address it here for the sake of completeness. Indeed, given the facts of this case, such a rationale cannot withstand even cursory analysis.

16

When a person is arrested inside the home, one strand of the so-called "protective sweep" doctrine, drawing upon the "search incident to arrest" exception to the warrant requirement, permits arresting officers, "as a precautionary matter and without probable cause or reasonable suspicion, [to] look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Maryland v. Buie, 494 U.S. 325, 334 (1990). This exception to the warrant requirement reflects the officers' need to ensure that an arrestee not have access to a weapon or to destructible evidence. See United States v. Perea, 986 F.2d 633, 643 (2d Cir. 1993). That concern is absent where the area to be searched is not within the arrestee's reasonably immediate reach, or "grab area." United States v. Blue, 78 F.3d 56, 60 (2d Cir. 1993); see Arizona v. Gant, 129 S. Ct. 1710, 1719 (2009).

The "grab area" prong of the Buie exception can apply in certain circumstances when an arrestee is afforded access to a particular area or item. See, e.g., United States v. Murphy, 16 F. Supp. 2d 397, 400 (S.D.N.Y. 1998); see also United States v. Kiyuyung, 171 F.3d 78, 80, 83 (2d Cir. 1999) (defendant's request to use the bathroom in her apartment after being arrested outside permitted security sweep of path to the bathroom) (vacating and remanding on other grounds). However,

17

arresting agents cannot create circumstances warranting application of the search incident to arrest exception merely by bringing the arrestee near the items or areas they wish to search, or vice versa. See Perea, 986 F.2d at 643.[17]

Of course, conducting a protective sweep of Barone's immediate "grab area," without more, could not have justified bringing Barone into the house after he was arrested outside.[18] Even assuming, arguendo, that the "grab area" exception could have permitted the arrest team to cross the threshold, such logic could not have justified the sweep of the upstairs rooms of the house under the circumstances. Cf. Murphy, 16 F. Supp. 2d at 400. Any potential threat posed by Barone, now handcuffed, had been neutralized, if not immediately when he was arrested and handcuffed in the driveway, then surely by the time he was brought into the foyer where he spoke with Agent Gaeta.

Indeed, there is no testimony that Barone actually requested to enter the house or its upstairs rooms, whether to change or gather clothes or to use the bathroom. (See 4/22/10

---

[17]    In Perea, the Second Circuit reasoned that, because the item searched (a duffel bag) was in the trunk of a cab when agents stopped the vehicle, the bag would not have been within the defendant's reasonable reach. Id. The court further reasoned that the agents could not have made the incident-to-arrest exception applicable simply by placing the defendant and the bag near one other after they arrested the defendant and opened the trunk. Id.
[18]    Nonetheless, Agent Gaeta testified that his team brought Barone and his then-girlfriend inside the residence for "security purposes" and to avoid "mak[ing] a scene in front of the house" in the quiet neighborhood. (4/22/10 Tr. at 7.) While we assume that "security purposes" was shorthand for the other prong of the "protective sweep" doctrine discussed below, even that rationale did not justify bringing Barone into the house. See Part I.B, infra.

Tr. at 41.) Rather, at least during the time of the initial security sweep in question, Barone remained handcuffed in the foyer, a floor away from the upstairs bedroom and closet where the first gun was found. (Id. at 8, 41.)[19]

Under these circumstances, the agents were not permitted to conduct the sort of precautionary "grab area" sweep announced in Buie. See Perea, 986 F.2d at 643.[20] Accordingly, we proceed to consider the other recognized category of "protective sweep," which focuses not on the safety risks posed by an arrestee himself, but the risks posed by other potentially dangerous persons hiding inside the home.

## B. "Protective Sweep": Dangerous Third Persons in Barone's Home

The government's main argument in support of the agents' entry and sweep of Barone's house was that it was the sort of "protective sweep" needed to safeguard arresting officers from

---

[19] Indeed, the bedroom and closet from which the first gun was actually seized during the initial security sweep was across the hall from the master bedroom where Barone presumably would have changed and gathered any belongings, even assuming he had requested to do so. (6/15/10 Tr. at 25.)

[20] In this connection, we note that the team of agents and detectives had been surveilling Barone throughout the day and followed him from the grocery store to his house immediately prior to his arrest. We recognize that perfectly legitimate public safety reasons may have led Gaeta's team to wait until Barone was in the driveway of his house to effectuate the arrest: they should not be expected to risk an unnecessary and potentially dangerous grocery store standoff or a car chase in apprehending a suspect. We need not and do not pass on Barone's counsel's claim that the circumstances leading to Barone's arrest were a pretext to enter and search Barone's home without a warrant, which they understood they could not obtain. Nonetheless, the fact that the agents could have arrested Barone prior to his returning home -- i.e., away from Barone's "turf" and therefore away from any risk of danger from within the house -- seems to be a relevant factor in assessing the reasonableness of the suspicion proffered as justification for the "protective sweep."

19

potentially dangerous third persons in hiding. This argument, too, is unavailing.

In Buie, the Supreme Court held that, in addition to the limited area "immediately adjoining the place of arrest," the Fourth Amendment permits officers executing an arrest inside a home to conduct a warrantless protective sweep of other parts of the residence if there exist "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." 494 U.S. at 334. The Supreme Court made clear that, if justified by the circumstances, this sort of protective sweep cannot be "a full search of the premises," but must be limited in both space and time: it "may extend only to a cursory inspection of those spaces where a person may be found" and may last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." Id. at 335 (emphasis added).

In addition, the Second Circuit has held that law enforcement officers may enter a defendant's home to perform a protective sweep even when the defendant is arrested outside of that home. To assess security sweeps incident to arrests outside the home, the Court of Appeals "applie[s] a standard

20

comparable to the reasonable suspicion test announced in Buie."
Oguns, 921 F.2d at 446. "[S]uch an entry [is] permissible if
the arresting officers '(1) had a reasonable belief that third
persons [were] inside, and (2) a reasonable belief that the
third persons [were] aware of the arrest outside the premises so
that they might destroy evidence, escape, or jeopardize the
safety of the officers or the public.'" Id. (quoting United
States v. Vasquez, 638 F.2d 507, 531 (2d Cir. 1980)).

The Court of Appeals has made clear, however, that mere
lack of information as to the presence of other persons on the
scene cannot amount to reasonable suspicion. Indeed, when there
is "nothing in the record from which a reasonable . . . officer
could have inferred that there was a specific danger of unknown
third-parties hiding in [the arrestee's residence]," a
protective sweep of the home will be deemed unlawful. See
United States v. Gandia, 424 F.3d 255, 264 (2d Cir. 2005);
United States v. Moran Vargas, 376 F.3d 112, 116-17 (2d Cir.
2004).

In Gandia, which the government cites, the Second Circuit
found a "protective sweep" unlawful because the only articulable
facts offered in support of the search were: "(1) the officers'
knowledge that [the defendant] had recently emerged from a
heated argument; (2) [a] police radio call which informed them
that [the defendant] might have a gun; (3) the fact that [the

defendant] stated he did not have a gun prior to being questioned about it; and (4) the fact that the officers had not recovered the gun during their patdown frisk of [the defendant]." 424 F.3d at 264. The Court of Appeals found nothing in these facts or elsewhere in the record from which a reasonable officer could infer "a specific danger of unknown third-parties hiding in [the] apartment." Id. Indeed, the Court of Appeals reasoned that "even if we agreed with the government's argument that where 'there is a strong reason for the officers to fear that there is an unaccounted-for gun on the scene, the circumstances suggesting that another person may be present on the scene need only be modest,' the government . . . [had] not made even a 'modest' showing." Id. (emphasis added).

Distinguishing and extrapolating from Gandia, the government argues that the arrest team's protective sweep was justified here because, in addition to the circumstances found wanting in Gandia -- i.e., a recent discussion about committing violent crime, the belief that the defendant possessed a firearm, the defendant's denial of possessing a firearm,[21] and the absence of any firearm on defendant's person -- the FBI also had articulable facts from which to infer that (1) unknown third-persons were now involved in the murder for hire plot; and

[21]     Notably, Barone did not deny possessing a firearm until after the arrest team had already entered his home. Cf. Gandia, 424 F.3d at 258 (defendant denied possession while still outside the residence).

22

(2) that plot was imminent. (Opp. Br. at 8 (citing 4/22/10 Tr. at 23, 29, 41); id. at 10.) Conceding, as they must, that the agents' lack of knowledge as to whether anyone else might be in Barone's house cannot suffice as "reasonable suspicion" to enter the residence and conduct a protective sweep, the government emphasizes nonetheless that the agents had "no way of knowing" whether unknown co-conspirators were located in Barone's home with potential access to a gun. (Compare Opp. Br. at 10, with 6/16/10 Tr. at 154.) Even according to the government's own analysis, the facts in this case cannot suffice to overcome the first hurdle of the Oguns test.[22]

Specifically, Agent Gaeta testified that "our concern in this case was the fact that [Barone] had relayed to the cooperator that he had access to a gun and was attempting to get it for him immediately, in addition to the fact that there were others unidentified that were involved in the murder-for-hire plot." (4/22/10 Tr. at 41; see id. at 5 (describing potential co-conspirator as a contingency).) That the other person Barone suggested he could hire as a contingency plan if the CW were

[22] We acknowledge that, if the government could overcome that crucial hurdle, the government would easily satisfy the second prong of the Oguns test here. The record reflects that Barone's arrest was effectuated during daylight hours, using a team of almost ten agents and at least two vehicles. In making that arrest in that "quiet residential neighborhood," (4/22/10 Tr. at 6-7), the agents would have reasonably believed that if other persons were inside the house, they would be aware of the arrest occurring outside. In addition, given the information and concerns prompting Barone's arrest, it would have been reasonable for the arresting agents to suspect that anyone inside the house would have access to a gun, posing a danger to the agents and the public. See Oguns, 921 F.2d at 446.

23

unable to carry out the murder was a "known unknown,"[23] rather than the "unknown unknown" that the court found wanting in Gandia, see 424 F.3d at 264, is ultimately a distinction without a difference. There is still nothing in the record -- either in the information gleaned from debriefing the CW[24] or in the actual observations of the arrest team on the scene -- from which the agents could have reasonably believed that the unknown contingency hit man Barone mentioned to the CW, or any other person, was inside Barone's house at the time they arrested him in the driveway.

Indeed, although the Task Force had been conducting surveillance on Barone throughout that day, not a single agent testified at the suppression hearing that he was aware at the time of the arrest of any information or specific concern that any third persons were or would be at Barone's single-family house, (see 6/15/10 Tr. at 32, 45, 56, 70), or recalled any sights or sounds on the scene that would have suggested that someone was inside that house. (See id. at 45, 70, 73.)

---

[23] See Hart Seely, The Poetry of D.H. Rumsfeld, SLATE (April 2, 2003, 1:03 p.m.).

[24] We note that, although (for reasons that remain puzzling to this Court) this information was not made immediately accessible to the agents, who may have received a less detailed account from the CW, the actual tape of Barone's conversation with the CW clearly supports the opposite inference from the one the agents purportedly drew here. (See 6/16/10 Tr. at 149 (quoting transcript of CW's recording).) Given that Barone told the CW that his girlfriend was coming over that afternoon and that he wanted to mull over some of the matters he and the CW had discussed, it was extremely unlikely that anyone connected with the alleged plot (or anyone else, for that matter) would have been in Barone's house that afternoon.

Compare Oguns, 921 F.2d at 446 (upholding validity of sweep where reasonable suspicion was based on information from a cooperator implicating both the defendant and his roommate, and where agents arresting defendant just outside of a two-family house noticed that the door to the defendant's apartment was ajar), with Gandia, 424 F.3d at 264 (finding no information to support a protective sweep, and distinguishing cases where officers heard or observed evidence that others were present on the scene).[25]

---

[25] Furthermore, beyond the absence of articulable facts to affirmatively support an objectively reasonable suspicion of third parties inside the home, the record of the duration and scope of the sweep that actually took place serves to undermine the argument that protection from third parties was the impetus for sweeping Barone's home. First, the sweep lasted approximately fifteen minutes. While duration alone may not be dispositive, several leading protective sweep cases in this Circuit involved far shorter time periods. See, e.g., Gandia, 424 F.3d at 259 (about a minute and a half); United States v. Isofia, 370 F.3d 226, 229 (2d Cir. 2004) (two minutes); Oguns, 921 F.2d at 445 (two minutes); Vasquez, 638 F.2d at 532 (two minutes). We recognize that protective sweep cases may often involve smaller apartments rather than split-level houses. We also assume that the agents in Barone's house were proceeding cautiously and with guns drawn, even though the testimony of the agents and detectives was not entirely clear in that respect. Nonetheless, fifteen minutes would seem to be an excessive amount of time for five agents to fan out and search for hidden persons in a sparsely furnished house with an area of less than 2,500 square feet.

Similarly, the places and manner in which the agents testified to conducting the sweep seem somewhat inconsistent with the purported purpose of locating dangerous persons in hiding. First, there was no testimony that anyone searched the basement, a classic hiding place, as part of the sweep. (See 4/22/10 Tr. at 40; 6/15/10 Tr. at 61.) While the agents' testimony that the bulletproof vest was not discovered in the basement until after Barone consented to the full search of the home does not necessarily establish that the basement was not also part of the protective sweep, the government concedes that the burden to fill that gap in the record was theirs. (See 6/16/10 Tr. at 171.) In addition, Agent Penza's testimony that as part of the protective sweep he looked in an upstairs closet and, spying an entry to the attic in the closet ceiling, lifted his head up into what turned out to be a small attic crawlspace, (6/15/10 Tr. at 71-72), was notable because Penza's casually hoisting his head up into that attic space seems inconsistent with a search for potentially dangerous hidden persons.

While, again, we need not find that Barone's arrest was pretext for a search, we nonetheless note that the testimony or lack thereof regarding how

25

While the absence of such concrete information or circumstantial evidence on the scene is not necessarily dispositive, see 3 Wayne R. LaFave, SEARCH & SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 6.4(c) (4th ed.), the facts that Gaeta and his arrest team reasonably suspected the potential involvement of an unknown co-conspirator in a plot which may have been imminent, and suspected the presence of firearms in Barone's house, cannot, under the totality of the circumstances presented, suffice to support a reasonable suspicion that that co-conspirator -- or any other person -- was actually at Barone's house at the time of his arrest. Were the law otherwise, in many conspiracy cases (particularly those involving weapons) an overly generous application of the "protective sweep" exception could swallow the presumptive rule against warrantless searches of houses.[26]

In this connection, the Second Circuit's reasoning in Oguns is particularly instructive:

the search was actually conducted seems to undermine its purported justification as a "protective sweep" for dangerous persons.
[26] That the possible presence of co-conspirators has been mentioned in this Circuit as a relevant factor in justifying protective sweeps, see United States v. Manley, 632 F.2d 978, 979-80, 987 (2d Cir. 1980), does not alter our conclusion here. While noting the presence of co-conspirators as a factor, the Second Circuit's decision in Manley turned on the agents' observations at the scene when executing an arrest warrant. Those agents could observe two people darting into and around the house they mistakenly believed to be that of a defendant who was presumed violent and likely armed. See id. at 980-81. The confused and harried circumstances of Manley are thus plainly distinguishable from the instant case, where Barone was arrested outside his home, carrying groceries and in the presence of his girlfriend, after being under surveillance throughout the day, and where the arresting agents had no intelligence or evidence on the scene to suggest that third parties were or might be in the house.

> Once police eliminate the dangers that justify a security sweep, . . . they must, barring other exigencies, leave the residence. Were this not the rule, searches begun as minor intrusions on domestic privacy would expand beyond their legitimate purposes. This concern is particularly germane to government-citizen encounters where, as here, agents subsequently seek the resident's consent to search his domicile.

921 F.2d at 447. Indeed, the risk of such illegitimate "expansion" was borne out in this case, given that the agents brought Barone into the residence from the very start,[27] engaged in an unusually long protective sweep, and, as discussed further below, exploited the fruit of that sweep to obtain Barone's consent and remain in the residence long after they had determined that their safety was not at risk.

Thus, in the absence of any alternative justification offered by the government (or apparent on the record), we hold that the entry and initial search of Barone's home was an unconstitutional intrusion. Accordingly, the gun seized from the upstairs closet -- as well as, for the reasons discussed in Part III, infra, the other evidence seized thereafter -- must be

---

[27] Even assuming, arguendo, that the commencement of the protective sweep by the agents alone would have been permissible under Oguns, we would remain unconvinced that there was a need to bring Barone and his girlfriend into the residence. Particularly given the size of the arrest team here, the agents' proffered "security purposes" or concern for avoiding a scene in the quiet residential neighborhood, (Tr. at 7), could have been served by procedures other than holding Barone in his residence. Cf. Gandia, 424 F.3d at 264. Unlike, for example, the agents in Oguns, where the Court of Appeals nonetheless took issue with the agents' reentry with the defendant after a two minute sweep was completed, see 921 F.2d at 447, the agents here brought Barone into the residence immediately and before even beginning their "protective sweep". These circumstances rendered the search even more problematic.

27

suppressed as "fruit of the poisonous tree." See generally Wong Sun v. United States, 371 U.S. 471 (1963). Before considering the admissibility of the remaining evidence, however, we turn to an alternative ground on which the first gun should be suppressed.

## II. The Seizure of the First Gun from an Upstairs Bedroom Closet

Even assuming, arguendo, that the agents acted lawfully in entering Barone's home with the defendant and commencing a "protective sweep" of the residence, we would nonetheless hold in the alternative that the seizure of the first gun from the upstairs bedroom closet was itself unlawful because the government failed to establish that the gun was in "plain view." See Kiyuyung, 171 F.3d at 83; Perea, 986 F.2d at 639. The "plain view" exception permits the warrantless seizure of an object, "if police are lawfully in a position from which they view [the] object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object." Kiyuyung, 171 F.3d at 83 (quoting Minnesota v. Dickerson, 508 U.S. 366, 375 (1993)); see Horton v. California, 496 U.S. 128, 136-37 (1990). Patently incriminating evidence in plain view during a proper security check may be seized without a warrant. See, e.g., Kiyuyung, 171 F.3d at 83.

Here, there is no dispute that Detective Arrigo seized the first gun from inside a case, which was inside a gift bag with handles, which, in turn, was placed somewhere in the upstairs closet. (See 6/15/10 Tr. at 26, 100-101.) As noted, that closet was slightly deeper than the width of a suit hanger and was split into two vertical sections, with top-to-bottom, eighteen-inch wide shelves on the left, and a clothes-hanging rung on the right, occupying more than half the width of the closet. (Id. at 100, 130.) The critical issue of fact for this Fourth Amendment analysis[28] is whether the gift bag was situated in the middle of the closet floor with the bag's contents arranged in such a manner that Detective Arrigo could have spied a box of ammunition in "plain view" inside the bag, as he testified, (6/15/10 Tr. at 26, 36, 44), or whether that bag was "tucked under" the bottom shelf on the back left side of closet, with a pink paper or cloth on top, as Barone testified. (Id. at 101.) If Barone's testimony is credited, the bag would necessarily have been out of plain view given the limited permissible scope of "protective sweeps" discussed in Part I, supra.

Whether Detective Arrigo's testimony demonstrated merely his stale recollection of detail or his lack of credibility, the

---

[28]   We emphasize again that this discussion assumes, arguendo, that Detective Arrigo was permitted to conduct a "protective sweep" of the bedroom and closet to search for hidden persons.

bottom line is that we cannot credit his description of how and where he observed the gift bag and ammunition box, which he said led him to discover the gun itself. In contrast, Barone's testimony, that the gift bag was "tucked under" the bottom shelf of the closet, rang true both in its detail and in light of the record here.

Arrigo's recollection almost a year and a half after the arrest date at issue was somewhat internally inconsistent -- and was, of course, at odds with Barone's more detailed description of a room and closet with which Barone, the homeowner, is more familiar. For example, Arrigo's testimony was not consistent as to whether, before he event went into the closet, he could already see that nobody was inside, or whether he needed to take a "one quarter step" to confirm that no one was hiding there -- at which point he looked down and saw the open gift bag and ammunition at his feet. (Compare 6/15/10 Tr. at 38-40, with id. at 43.) Of greater note, he testified that when he entered the bedroom, closed the door, and turned around, he was able to see into the closet because the doors were open. (6/15/10 Tr. at 39.)

In contrast, Barone testified that the door to the bedroom and the French doors to the closet were on perpendicular walls

and opened toward each other -- such that opening the bedroom door would have pushed the closet door closed when Arrigo entered that bedroom. (Id. at 129-30.) He explained the layout of the closet in detail, and recalled that he had a watch case, a clear glass case, and some other items on the shelves on the left hand side. On the floor underneath the bottom shelf, the white gift bag was tucked away, with its wire handles "ben[t] a bit" to fit in the space under that shelf, which was less than eighteen to twenty inches. (Id. at 100-101.)

In light of the evidence already adduced before he testified, this Court was initially skeptical of Arrigo's testimony that a gift bag containing an encased gun and ammunition box -- packaging otherwise consistent with an intent to conceal (unlike, for example, a loaded gun placed on a shelf for easy access) -- was nonetheless sitting in the middle of the floor of an open closet.[30] (See 6/16/10 Tr. at 160.) Our initial skepticism of Arrigo's account was only magnified by the testimony of the witnesses who followed. The record is undisputed that Barone hid his second gun -- and hid it well. Indeed, Agent Castner had to engage in what sounded like an Abbott and Costello routine to clarify Barone's directions to the "iron" box in the garage before he was able to find the

---

[30]    Our impression might have been different if, for example, Arrigo had testified that he pulled back some hanging clothes in the closet (consistent with searching for hidden persons), to discover the open gift bag and ammunition box on that part of the closet floor.

31

second gun in the appliance box. (Id. at 50-51; see Gov't Ex.
3501-5.) Castner's initial difficulty in locating the well-
hidden second gun underscores the implausibility of Arrigo's
testimony that the first gun -- or rather, the bag in which it
was stored and the box of ammunition on top -- would have been
sitting fully exposed in the middle of the closet. In contrast,
we were struck by Barone's recollection that, to fit under the
bottom shelf of the closet, the gift bag's wire hangers had to
"bend a bit." That detail rings particularly true. (Id. at
100-101.)

Emphasizing that Barone denied signing the consent to
search form at 26 Federal Plaza, the government contends that
Barone is not credible. While, as noted, we do not need a
handwriting expert to recognize Barone's signature, we also do
not need to parse the credibility of every aspect of his
testimony in order to find credible his description of the
layout of his own home and the details of how he admittedly
concealed a gun bag in the upstairs closet. Indeed, the notion
that Barone concealed the gun and ammunition bag under a shelf
rather than in plain view on the closet floor is supported by
his acknowledgment at the hearing that he knew it was against
the law for him to possess guns. (See id. at 109.)

In contrast, and as indicated above, we do not credit
Detective Arrigo's testimony that he found the bag and spied the

32

ammunition box in plain view. With the gift bag tucked under the closet shelf and topped with pink wrapping cloth or paper, the ammunition box could not have been in plain view during an otherwise proper "protective sweep" of that closet. Under these circumstances, we reject the government's argument that Arrigo could not have had any motivation to "shade the truth" at the hearing. Accordingly, we hold that, even assuming the protective sweep was otherwise lawful, the seizure of the gun from the upstairs closet during that sweep was itself improper.

Under either analysis, the first gun must be suppressed.

## III. **Barone's Subsequent Consent to Search Following the Illegal Entry and Confrontation with the Illegally Seized First Gun**

As discussed in Part I, supra, the first gun plainly must be suppressed as "fruit of the poisonous tree" because the entry and protective sweep of Barone's home was illegal.[31]   In addition, under Wong Sun, the arrest team's illegal entry and protective sweep invalidates Barone's consent unless "the taint of the initial entry had been dissipated before the 'consents' to search were given." Oguns, 921 F.2d at 447 (quoting Vasquez, 638 F.2d at 527). The government bears the burden of showing that this taint has been alleviated, id. (citations omitted),

---

[31]   In addition, and as discussed in Part II, supra, the first gun must be suppressed even assuming, arguendo, that the entry and protective sweep were proper -- because we find that the bag and ammunition box was not in "plain view" and therefore could not have been properly seized in Detective Arrigo's search. Though the "attenuation" analysis that follows is substantially the same under either source of "taint," we note the distinctions where appropriate.

33

and must show that the consent "was sufficiently an act of free will to purge the primary taint of the unlawful invasion." Id. (citations omitted). "In assessing whether the taint of the illegal entry was sufficiently diminished, [courts] consider four factors: whether a Miranda warning was given, the temporal proximity of the illegal entry and the alleged consent, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct." Id. (citations and internal quotation marks omitted).

We reject at the outset the premise of the government's alternative argument that, because the remaining physical evidence -- including the second gun found in the garage -- was obtained pursuant to Barone's subsequent consent to a full search of his home and not during the protective sweep, it could not be "tainted" by the protective sweep even if the entry and sweep were found to be illegal. (Opp. Br. at 11.) First, as the government's briefing and oral arguments implicitly acknowledged, the "fruit of the poisonous tree" doctrine applies to consents following an illegal entry as well as to physical evidence seized. See Oguns, 921 F.2d at 447.

Second, and more importantly, the government's argument depends upon a myopic framing of the facts. The record is clear that before Barone consented to any full search of his home, Agent Gaeta confronted Barone with the agents' discovery of the

first gun -- and the fact that Barone had lied to them -- and asked Barone if there were any other weapons in the house. (4/22/10 Tr. at 9, 38.) Analytically, then, in addition to being direct "fruit" of the illegal entry, Barone's consent is also derivative "fruit," because Agent Gaeta exploited the tainted gun in seeking further consent to search. See, e.g., United States v. Tontorello, 533 F.2d 809, 814 (2d Cir. 1976) (reasoning that agents' use of information obtained from an illegal search in order to obtain consent to further "voluntary" search may taint that consent).

Mindful that a finding of attenuation "ordinarily involves [a] showing that there was some significant intervening time, space, or event," Vasquez, 638 F.2d at 528; see also United States v. Valentine, 591 F. Supp. 2d 238, 247 (E.D.N.Y. 2008), we consider the four attenuation factors in turn.[32]

## A. Miranda Warnings

As for the first factor, although Barone testified that he was not Mirandized until after he was taken by van from the house to Federal Plaza, (6/15/10 Tr. at 134-35), Agent Gaeta clearly recalled that, after entering the residence with Barone

---

[32]     We proceed to weigh these factors in the interest of completeness -- and pursuant to the law in this Circuit.  We note, however, that in cases where the "poisonous tree" is an illegal search and the defendant is confronted with incriminating evidence illegally seized, such that the "the cat is out of the bag," the exploitation of illegality may render a more fine-tuned attenuation analysis unnecessary.  Cf. 6 LaFave, SEARCH & SEIZURE § 11.4(c), at 307 (discussing confessions).

35

and asking whether he had any weapons, he provided Barone with Miranda warnings. (4/22/10 Tr. at 8.) We credit that testimony. That Miranda warnings were given following the illegal entry, and that Barone decided to speak with Gaeta in an attempt to "work it out," weighs in the government's favor for attenuation purposes.

There is no dispute that after he received his Miranda warnings, Barone spoke to Agents Gaeta and Trombetta, relying on his existing relationship with the FBI in an effort to talk his way out of the situation in which he found himself. However, that is quite different from the government's suggestion that Barone had decided to cooperate shortly after his arrest. Indeed, the fact that Barone lied to Gaeta about the presence of guns immediately before receiving his Miranda warnings would seem to undermine that argument.

## B. Temporal Proximity of the Illegal Conduct and the Consent

As the government concedes that very little time elapsed between the illegal entry and Barone's consent, the "temporal proximity" factor merits little further discussion. Indeed, while the precise timeframe between the illegal entry and Barone's consent to search is not clear, fifteen minutes would be the maximum spread. In addition, the temporal proximity between Agent Gaeta's confronting Barone with the gun (which was

either the fruit of the illegal sweep or was otherwise illegally seized because it was not in "plain view") and Barone's consent to search the garage and house was immediate. (4/22/10 Tr. at 9, 38.)

## C.   Intervening Circumstances

"[A]s Oguns recognized, intervening events, even within a brief time, can sometimes sever the causal connection between an illegal entry and a subsequent consent to search, thereby permitting a court to conclude that the consent fairly reflects an act of free will." United States v. Snype, 441 F.3d 119, 135 (2d Cir. 2006).    However, the record here is devoid of any significant intervening circumstances other than what the government frames as Barone's "intervening consents," for example, when he repeated his explanation to Agent Castner regarding the location of the second gun in the "iron" box. (See 6/16/10 Tr. at 176.)    Again, this line of argument begs the question:   to carry its burden to establish that Barone's consents "[were] sufficiently  . . .  act[s] of free will to purge the primary taint of the unlawful invasion," see Oguns, 921 F.2d at 447, the government must show that "the taint of the initial entry," and, in this case, of Agent Gaeta's exploiting the fruit of that illegal entry by confronting Barone with the gun, "had been dissipated before the 'consents' to search were given." Id. (emphasis added).

37

Here, as we have just noted, the timeframe did not exceed fifteen minutes. What is more, no written consent forms (which, as Oguns emphasized, can weigh in favor of attenuation) were ever reviewed with or signed by Barone at the arrest scene.

Nor did Agent Trombetta's testimony support the government's attenuation argument. Trombetta's testimony described a brief conversation with Barone, which lasted a matter of minutes (clearly less than fifteen), and which did not address the substantive charges in the case or anything about proactive cooperation beyond encouraging Barone "to be truthful." Trombetta also testified that his relationship with Barone was "professional" -- that is, he did not give any indication that he was a trusted confidante of Barone's, which could have changed the nature of their conversation and possibly the circumstances at the house. Furthermore, the conversation itself took place in the middle of the ongoing search, with other agents and detectives working all around them. (Id. at 89, 93.) Indeed, Barone's conduct and demeanor did not change after his conversation with Trombetta -- he remained "scared and nervous." (Id. at 91-92.) Cf. 6 LaFave, SEARCH AND SEIZURE § 11.4(b), at 297 & n.184 (noting that consultations with a close family member, friend, or parole officer at a defendant's request have been treated as intervening circumstances where the defendants' conduct changed thereafter) (collecting cases).

Accordingly, we cannot find any significant "intervening circumstances" that would support the government's argument for attenuation here.[33]

## D. **Purpose and Flagrancy of the Official Misconduct**

The government argues that the last factor, the "purpose and flagrancy of the official misconduct" weighs heavily in favor of attenuation (and thus, admissibility) here. We disagree. Regardless of the motivations of the agents, who had obtained authorization for the arrest with the understanding that they lacked probable cause for a search of Barone's home, there were, as discussed, several significant issues with respect to the search.[34]

First, as noted, the agents did not believe they had probable cause for a search warrant. Further, there is some indication in the record that despite, or perhaps because of, that understanding, the agents planned to conduct a protective sweep and speak to Barone inside his residence after arresting him outside the home. (See 4/22/10 Tr. at 22-23.) For example,

---

[33]    The government's focus on Barone's apparent willingness to cooperate after his arrival at 26 Federal Plaza is misplaced. While it is clear that after counsel was appointed for Barone, he eventually became interested in cooperating, as he had done for the FBI in the past, the "intervening circumstances" factor -- and attenuation analysis generally -- appropriately focuses on circumstances before any consent was given, not after.
[34]    Our discussion is only directed to the search. As we previously stated at oral argument, we have no issues with the justification for Barone's arrest. (See 6/16/10 Tr. at 153.)

39

Agent Gaeta testified that once he knew they were going to arrest Barone, he called Agent Trombetta to see if he could "meet [the team] at Mr. Barone's residence so he could speak to Barone." (Id. at 28.) This call suggests that Gaeta may have planned to remain in the residence after the arrest was made. Moreover, Agent Penza's testimony that the team entered the house to "to get in, ensure that the house was secure and safe, and then move ahead with the process, whatever it would be," could reveal a purpose to remain in the residence beyond completion of the protective sweep -- which, absent other exigencies, is clearly impermissible under Oguns -- and which the arrest team actually did here. See 921 F.2d at 446.

Second, the agents entered Barone's home without a warrant -- crossing a clear Fourth Amendment threshold -- and without any articulable, reasonable basis to suspect that third parties were inside.

Third, once inside, the agents' purported "protective sweep" was excessive in duration and scope -- and entailed the seizure of a gun which was not in plain view.

Fourth, the agents clearly could not have justified the protective sweep as an extension of Barone's "grab area" under the circumstances here.

40

Fifth, not one of the eight to ten arresting agents obtained a written and signed consent to search from Barone on the scene.

Considering these issues together -- and particularly in light of the established law in this area -- the official misconduct here seems flagrant indeed. If anything, this factor weighs against the government's position.

\* \* \*

In sum, upon balancing the relevant attenuation factors, we cannot conclude that intervening events satisfactorily severed the connection between either the arrest team's illegal entry or Agent Gaeta's exploitation of the illegally-seized first gun and Barone's consent. Accordingly, the taint of the primary illegality had not dissipated and the physical evidence seized following Barone's "consents" must, like the first gun seized from his closet, be suppressed.[35]

---

[35] In this connection, we note further that -- separate and apart from the attenuation analysis -- the circumstances at Barone's house would render his consent involuntary. The law regarding consents to warrantless searches in this Circuit was well-summarized by Judge Underhill in United States v. Reyes, No. 3:06cr120(SRU), 2007 WL 419636 (D. Conn. Jan. 30, 2007). As the court there explained:

Consent is voluntary if it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Whether a suspect gave his consent voluntarily is a fact-intensive inquiry that courts determine by the totality of all the circumstances. Courts consider the defendant's age, education, intelligence, length of detention[;] the government's use of physical punishments or deprivations[;] and whether the alleged consenting person was advised of his constitutional rights. In addition, the Second Circuit has found, in cases where consent is obtained from a person in custody, that whether

41

## CONCLUSION

We are not unmindful of the impact of our decision on this case going forward. However, we are equally mindful of our sworn duty to uphold the Constitution. Given the numerous violations of the Fourth Amendment here, the need to exclude evidence "to compel respect for the Fourth Amendment's guarantees" outweighs the costs of applying the exclusionary rule. See United States v. Julius, 2010 WL 2331119 at *6, *7-8 (2d Cir. June 11, 2010).

For the foregoing reasons, Barone's motion to suppress is GRANTED in its entirety.

**IT IS SO ORDERED.**

Dated:  New York, New York
        June 25, 2010

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

---

guns were drawn or the consenting individual was frisked . . . or whether the consenting individual was threatened, was in a public area, or was informed that he had the option of refusing consent to the search . . . [are] relevant factors in determining the voluntariness of the consent. [T]he fact that a defendant is in custody does not alone vitiate his consent to a search, but consent to search obtained from a person in custody does require more careful scrutiny. A suspect's consent is not voluntary when the suspect merely acquiesces and submits to apparent lawful authority. The ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search.

Id. at *4. Given the totality of the circumstances discussed in this opinion, particularly the agents' exploitation of the illegally seized first gun to demand the location of any other weapons, and their threat to break the safe if Barone did not open it, the verbal "consents" Barone gave at his house seem far more like mere "acquiescence" to the agents' authority than the product of his truly "free and deliberate choice." See id.

A copy of the foregoing Memorandum and Order has been mailed on
this date to the following:

John T. Zach, AUSA
Chi T. Steve Kwok, AUSA
U.S. Attorney's Office
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

Jose A. Muniz, Esq.
277 Broadway, Suite 108
New York, NY 10007

Edward A. McDonald
Dechert, LLP
1095 Avenue of the Americas
New York, NY 10036-6797